[Civ. No. 5877. First Appellate District, Division Two.—February 1, 1929.]

MARIE MAND, as Administratrix, etc., Respondent, v. HARRY ROSE, Appellant.

Horace W. B. Smith and James Davis for Appellant.

Everts, Ewing, Wild & Everts, L. W. Young and Dan F. Conway for Respondent.

LUCAS, J., *pro tem.*—■ Appealing from the judgment on a verdict for damages resulting from the negligence of a minor, Harry Rose, one of the defendants and the sole appellant herein, contends that the evidence is insufficient

to support the verdict. Two arguments are advanced: First, that the said minor was not an employee of the appellant; and second, that if it be held he was an employee, he was not acting within the scope of his employment at the time of the injury complained of. Appellant has not urged the first point with any great degree of earnestness, and indeed there is little merit in it. The record shows that appellant was either the sole owner of the Valley Auction Company or a joint venturer therein with defendant J. Boust, who assumed the entire management of the enterprise and employed the said minor in furtherance of its general objects and business. In either event appellant would be liable for injuries resulting from the negligent acts of the employee committed while acting within the general scope of his employment.

The business of the so-called Valley Auction Company was that of selling second-hand automobiles at public auction. To assist in preparing for the auctions the Valley Auction Company, through the said Boust, auctioneer, employed the said minor, Frank Rogers. Rogers was employed the day prior to the first auction, and his first duties consisted in distributing around town circulars in reference to the auction the following day. After the circulars were handed out, Rogers informed Boust that he knew how to wash cars. Upon orders of Boust, Rogers washed Boust's Ford car. Boust, apparently being satisfied with the work, called up Rose and asked him if he wanted to sell his car at auction, saying, "You better bring it down and let us wash it up." Rose told Boust to come down and get the car. Boust and Rogers drove down to appellant's place of business in Boust's Ford. Rogers, who had no driver's license, acting under orders from Boust, returned to the lot of the Valley Auction Company with Boust's Ford, and Boust returned to the lot with appellant's Dodge car. Boust told Rogers to wash and polish appellant's car as he wanted to offer it for sale at Saturday's auction. Rogers testified that prior to washing the car he drove it on to the lot occupied by the Valley Auction Company, and was seen so to do by Boust, who made no objections.

According to Boust's testimony the following conversation took place prior to Rogers' washing the car:

Boust: "I drove it (Rose's car) down on the lot, drove the car on the washrack and told Rogers to go ahead and wash

it up. He went inside and I told him, I said, 'I will be gone about an hour and a half.' I said, 'Answer the phone calls,' like that. He said, 'There is no polish here.' I said, 'There is some simonizing in the car.' I said, 'That is good enough,' like that."

Rogers testified: "After it (the car) dried, I looked in the car to see if there was any polish in there and there was no polish but just the cleaner polish, so he (referring to Boust) wasn't there and I thought I would go down where I lived down there near the filling station and get some oil polish. Q. Mr. Rogers, when you proceeded to go out to get the polish, did you have any business whatsoever, of your own, that you went out there on? I mean by that, did you go out there merely for the purpose of getting the polish? A. Yes, sir. Q. And you had no business of your own out there? A. No, sir."

In reference to conditioning autos for sale, Boust testified: "Q. In other words, you tried to make your stock look as nice as possible? A. Yes, at an auction, understand, we sell to the highest dealer. Q. But in order to get the high dealer you have to have your goods looking in good shape. A. Naturally you do."

Rogers drove appellant's car out for the purpose of getting the proper oil polish, and on this trip carelessly and negligently ran into and injured F. G. Mand, who some two months later died. Whether or not the accident was the proximate cause of his death is immaterial, as the validity of the judgment in so far as the amount thereof is concerned is not attacked.

The sole question for the court's determination herein is whether or not in the circumstances above outlined it can be held that the said Rogers was acting within the scope of his employment at the time of the injury to plaintiff's intestate.

The general rule as heretofore stated by this court in the case of *Wagnitz* v. *Scharetg*, 89 Cal. App. 511 [265 Pac. 318], is:

"Where the evidence conclusively shows that a servant deviated from the general scope of his authority in but a slight and not unusual manner, the court may as a matter of law determine that the servant was about his master's

business. If the deviation is great and unusual, the court may likewise as a matter of law determine that the servant was not about his master's business but his own. Cases falling between these extremes will be regarded as involving merely a question of fact to be left to the jury." (Citing Berry, The Law of Automobiles, 4th ed., pp. 1078, 1079, and cases cited; also, *Kruse et al.* v. *White Bros. et al.*, 81 Cal. App., at p. 86 [253 Pac. 178].)

We are of the opinion that the facts in this case do not warrant the court in saying as a matter of law that the said Rogers either was or was not about his master's business at the time of the accident. We believe the case presents purely a question of fact for the jury to decide, particularly in view of the rule laid down in 18 R. C. L., page 796: "Where a servant steps aside from the master's business and does an act not connected with the business, which is hurtful to another, manifestly the master is not liable for such act, for the reason that having left his employer's business, the relation of master and servant did not exist as to the wrongful act; but if the servant continues about the business of the employer, adopts methods which he deems necessary, expedient or convenient, and the methods adopted prove hurtful to others, the employer is liable."

The supporting authority for the last part of the rule is even stronger than the rule itself. See *Pittsburg, Cincinnati & St. Louis Ry. Co.* v. *Kirk*, 102 Ind. 399, 402 [52 Am. Rep., page 675, at 677, 1 N. E. 849, 852]: "Where a servant is engaged in accomplishing an end which is within the scope of his employment, and while so engaged adopts means reasonably intended and directed to the end which result in injury to another, the master is answerable for the consequences, regardless of the motives which induced the adoption of the means; and this, too, even though the means employed were outside his authority, and against the express orders of the master." (2 Thompson on Negligence, 889, sec. 6; Wood's Master and Servant, 593, 594.)

The jury having passed upon the question of fact, and the evidence being, in the opinion of the court, sufficient to support the verdict, the judgment appealed from is affirmed.

Koford, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 1, 1929, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 1, 1929.

All the Justices present concurred.